Estate of Ethel M. Bullock, Deceased, Hubert A. Foster, Executor v. Commissioner.
Estate of Bullock v. Commissioner
Docket No. 63103.
United States Tax Court
T.C. Memo 1960-204; 1960 Tax Ct. Memo LEXIS 81; 19 T.C.M. (CCH) 1080; T.C.M. (RIA) 60204; September 30, 1960
Sidney R. Reed, 608 South Hill Street, Los Angeles, Calif., for the petitioner. Alfred L. Margolis, Esq., and R. E. Maiden, Jr, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined a deficiency of $22,827.32 in the estate tax liability of the petitioner. The issues remaining for our decision are: (1) Whether the real estate comprising the Hotel Mayfair property should be fully included in decedent's gross estate; (2) whether the personal property there should be so included; (3) whether the real estate comprising the El Patio property should be so included; (4) whether the fees paid by the executor (who is also a *82 beneficiary) in the will contest are deductible in an amount beyond that which the probate court allowed to be charged against the estate; (5) whether certain uncashed checks held by Clara Foster represent a deductible claim against the estate; (6) whether the real estate known as Bouquet Canyon was fully includible in the gross estate; (7) whether certain mortgages, notes and cash are includible in the gross estate; and two additional issues which we deem to have been abandoned. General Findings of Fact Some of the facts have been stipulated and are so found. Petitioner is the Estate of Ethel M. Bullock, who died testate on October 31, 1951, a resident of Pomona, California. Ethel M. Bullock, hereinafter referred to as the decedent, was survived by her three children: Zelma E. Hildebrand, Ottis (Jimmie or James) B. Foster and Hubert A. Foster, hereinafter called Zelma, Ottis and Hubert. Hubert is the executor of decedent's estate. Issue 1. Hotel Mayfair Realty Findings of Fact In 1918, decedent acquired the Hotel Mayfair, which is located in Pomona, California, and hereinafter referred to as the hotel. From September 1941 and until decedent's death, Hubert managed the *83 hotel's bar and dining room under an informal oral arrangement with her. During that entire period, decedent and Hubert shared the profits from the hotel's bar and dining room equally and all other income from the hotel went solely to the decedent. Partnership returns were filed for the calendar years 1943 to 1950, inclusive, [1] by decedent and Hubert. On the partnership returns for the years 1946 to 1950, inclusive, the name and business or profession of the partnership were stated to be as follows: Business
Year
Name
or Profession
1946
Hotel Mayfair
1947
Hotel Mayfair
Sale of Food and
Beverages
1948
Mayfair Hotel
Sale of Food and
Beverages
1949
Hotel Mayfair
Retail of Food (in
Hotel) and Bev-
erages
1950
Mayfair Hotel
Hotel Owner
Handwritten notations on the typed schedules for the years 1946 and 1948 describe the profits (or losses) of those years from the bar and dining room as attributable to a "partnership" and the hotel profit as attributable to a "proprietorship." On October 1, 1945, decedent deeded to Hubert an undivided *84 one-half interest in the hotel. This deed was mailed to Hubert shortly after it was executed, but decedent requested that Hubert not record it at this time, and he did not record it until November 8, 1951, 8 days after decedent's death. Ever since 1941 and after as well as before the 1945 deed just described, the understanding between Hubert and decedent was that decedent would receive all the profits from the operation of the hotel rooms and Hubert would operate the bar and dining room in the hotel, paying no rent for use of that space, and receiving one-half of the bar and dining room profits as compensation for his services as manager. On a number of occasions, decedent had obtained loans from the Bank of America, and the Pomona branch of said bank maintained two files on her transactions. One such file, relating to her unsecured loans, contained, among other items, several financial statements signed by the decedent. These statements indicated that the status of the hotel was as follows: Date of
Financial Statement
Status of the Hotel
May 31, 1945
Asset of decedent
July 31, 1946
Asset of Hotel Mayfair Part-nership
Dec. 31, 1948
Asset of Hotel Mayfair Part-nership
Mar. 31, 1950
Asset of Hotel Mayfair Part-nership
June 9, 1951
Asset of decedent
*85 The other such file, relating to the decedent's secured loans, contained a loan application signed by the decedent and dated January 26, 1950. This application stated that title to the hotel was vested in the decedent and it did not disclose that any other interest in said hotel existed. Subsequent to the above-mentioned application, the decedent obtained three loans from the Bank of America with the hotel property as security for said loans. In each instance, decedent executed, as sole owner, a deed of trust which conveyed the hotel property. The dates of said deeds of trust and the amount of each secured loan were as follows: Amount of
Date
Secured Loan
February 6, 1950
$15,000
February 21, 1951
5,000
August 13, 1951
25,000
Hubert accompanied the decedent when she obtained these three secured loans and he was aware of the fact that she represented herself to the Bank of America as the sole owner of the property, but did nothing to dispute or contest such representation. The dates are not disclosed by the record, but shortly after decedent's death, Zelma and Ottis filed suits to contest her will. The Bank of America was appointed and served as Special *86 Administrator while they were pending and, among other things, operated the Hotel Mayfair as an asset of decedent's estate. The said suits were finally settled before trial. At no time after decedent's death did Hubert make any claim against the estate for any rental for use of the realty or of the personalty of the Hotel Mayfair, or for any share of its operations. The entire operation of the hotel, including the bar and dining room, was recorded in a set of books entitled "Mayfair Hotel." It appears that separate income and expense accounts for the bar, dining room and hotel proper were maintained in this set of books and one of its ledger accounts contained, in part, the following information: Note Payable
TD Payable
Date
Posting
1949
Description
Ref.
Charges
Credits
Dr. or
Balance
Cr.
1/31[50]
T.D. 2 yrs 5%
J 46
15,000.00
(15,000.00)
2/28/51
J 53
5,000.00
(20,000.00)
10/31[51]
J 57
5,500.00
(25,500.00) Another ledger account in said books was labeled "Capital Investment-Partners" and, in the margin of this ledger account appeared the following breakdown of its balance: Ethel M.
Hubert A.
Bullock
Foster
12/31/1945
$33,007.24
$39,961.69
12/31/1946
38,313.12
33,787.26
12/31/1947
34,594.97
31,168.99
12/31/1948
26,352.99
25,801.45
12/31/1949
17,519.97
20,291.42
12/31/1950
8,421.60
17,325.35
10/31/1951
3,373.90
14,525.35
*87 In her will dated October 24, 1945, decedent made reference to her earlier conveyance of an undivided one-half interest in the hotel to Hubert, then devised the remaining one-half interest - one-third each to Hubert, Ottis and Zelma. An inventory and appraisement for the Estate of Ethel M. Bullock, i.e., the petitioner, was filed on July 8, 1952, in the Superior Court of the State of California in and for the County of Los Angeles. Hubert, as executor of the estate, signed this inventory and appraisement which listed, inter alia, as an asset an undivided one-half interest in the hotel property. The Federal estate tax return dated March 30, 1953, was filed on March 31, 1953. Hubert, as executor of the decedent's estate, signed the return and listed as an asset an undivided one-half interest in the hotel. The full amount of the mortgage indebtedness on this property was included in the schedule of mortgages. Petitioner's fiduciary income tax return for the calendar year 1954 is the only one in the record. It was signed by Hubert and the entire operation of the hotel was reflected therein (including the entire capital gain realized on sale of the hotel). [2] The schedules attached *88 to and made a part of the return contained the following information: ESTATE OF ETHEL M. BULLOCK
Mayfair Hotel, Pamona, California
Income Tax Returns - 1954
Statement of Income and Expense
January 1, to September 30, 1954
Income: Sales: Hotel
$ 25,745.48
Bar
22,786.92
Dining Room
14,493.30
Miscellaneous Income
1,693.83
Total Income
$64,719.53
Expenses: (Including depreciation of
77,974.14
$3,150)
Net Loss
$13,254.61
Capital Gain: Mayfair Hotel
Sold 9/30/54
$158,000.00
Less expense of sale
5,919.19
$152,080.81
Cost 11/1/51
$157,366.91
Less depreciation
11,900.00
145,466.91
Gain
$ 6,613.90
Capital Losses:
1,015.66
Total Gain
$ 5,598.24
50 per cent of Total Gain
$ 2,799.12
The joint income tax returns of Hubert and his wife, Clara B. Foster, for the calendar years 1950, 1953 and 1954 are the only ones in the record. The 1950 *89 return reported Hubert's share of the loss sustained in the operation of the hotel. The returns for 1953 and 1954 did not report such share, nor did they reflect any share of the capital gain realized on sale of the hotel. Opinion Respondent has determined that the entire value of the Hotel Mayfair realty should be included in the gross estate under section 811(c)(1)(B). [3]
*90 Petitioner contends that decedent owned but a one-half interest in this realty and that accordingly only the value of such interest, now agreed to be $68,000, may be included in her gross estate; but the actions of Hubert and decedent were inconsistent in most respects with this position. Rather, they evinced a tacit understanding and agreement that the decedent was to have full dominion and control over the property until her death. Our conclusion in this regard is supported, inter alia, by Hubert's failure to record the deed for more than 6 years, and until after his mother's death; by the lack of any change in the manner of division of profits and losses between Hubert and decedent before and after the October 1945 deed; by decedent's repeated representations (made with Hubert's acquiescence) that she was the sole owner of the property, the last of which was made within 3 months of her death; and by petitioner's and Hubert's income tax returns indicating sole ownership of this realty by decedent. Indeed, some of Hubert's actions go even further, and indicate a recognition by him that his mother was the sole owner of this property. In this category are his failure to make any *91 claims against the estate even though pending will contest suits cast doubt on his ultimate participation; his inclusion of the entire mortgage as a claim against the estate; and the representations on most of the partnership income tax returns that its business was the sale of food and beverages. Petitioner attempts to explain away phases of the operation of the partnership which do not square with part ownership of the property by Hubert, as inter-partner adjustments. We observe that only an oral partnership could be so ideally flexible, and we also note that when being questioned about division of revenues between himself and his mother, Hubert repeatedly emphasized that his mother took all room rentals because she was getting no "rent" from the bar or dining room. What of Hubert's rent from his half interest? The question is unanswered. In attempting to minimize the weight to be given his own, the estate's, and the partnership's income tax returns, Hubert testified that he merely signed them as prepared by a certified public accountant, and petitioner contends, on reply brief, that Hubert was "firmly in the hands of not too capable advisors." Even if this is so, the fact remains *92 that Hubert did sign these returns and we cannot presume that he was completely oblivious to their content and representations. All of the above indicates to us a domination over this property by decedent and a general recognition by Hubert of his mother's ownership of the property. Against this background the deed from mother to son appears to be nothing more than a testamentary disposition. [4]
Furthermore, we have found that the partnership arrangement gave to Hubert nothing but a share in the profits of the bar and dining room commencing in 1941. We believe that the entire arrangement between mother and son was that she would furnish quarters and facilities for the bar and dining room, he would furnish management and his own labor, and they would share results. Hence, even assuming the existence of a rather loose *93 partnership, we cannot conclude that by virtue thereof Hubert acquired any interest in the realty. In any event, assuming arguendo that decedent had in fact transferred a one-half interest in the hotel prior to her death, we feel that the entire value of the property must nevertheless be included in her estate under section 811(c)(1)(B) [5] on the theory that decedent transferred property (without adequate and full consideration in money or money's worth) in which she retained a life estate. The record clearly establishes that decedent was receiving, in effect, all the rents from the hotel until her death and thus retained all the economic benefits of ownership. Such retention brings the property squarely within section 811(c)(1)(B). We find this case indistinguishable from Estate of Daniel McNichol, 29 T.C. 1179, affd. 265 F. 2d 667 (C.A. 3, 1959), certiorari denied 361 U.S. 829, where we said at page 1184: In the case of income-producing property, there could be no clearer example of the retention of such an economic benefit than the retention of the income itself. Possession or enjoyment of the property exists, within the meaning of section *94 811(c)(1)(B), where the property involved was income-producing property and the deceased received the income therefrom, whether the deceased did so by virtue of the instrument of transfer or by the acquiescence of the transferee. In Hubert's own words, the profit division in the partnership agreement was designed "In compensation for the space that I was using for the bar and dining room." That the purported 1945 change in ownership did not alter the beneficial enjoyment is cogently demonstrated by the fact that such change was unaccompanied by either a payment of rent to Hubert or an increase in his share of profits or losses from the business. Accordingly, we hold that the entire value of the Mayfair Hotel property must be included in decedent's gross estate. Issue 2. Hotel Mayfair Personalty Findings of Fact In her will decedent bequeathed all her personal property used in connection with the operation of the hotel to Hubert. Inventory and appraisement for the estate was sworn to by Hubert, as executor, on July 3 and filed July 8, 1952. It listed all that personal property as belonging to decedent. [6] The estate tax return (filed in March *95 1953) included only one-half of each of these items for a total value of $10,950.36. Hubert never made any claim against the estate for, or for the use of, any personal property located at the hotel. Opinion Respondent has determined that the value of all of the personal property located at the hotel is includible in decedent's gross estate. The burden is upon the petitioner to establish that these particular items were not owned solely by decedent at the time of her death, and here petitioner is not aided by any deed or instrument of conveyance. Many of Hubert's and decedent's actions as respects this personal property are consistent only with ownership by decedent. Thus we consider as quite significant the fact that it was all listed as an asset of decedent's estate in the inventory and appraisement, sworn to by Hubert. Decedent's will recognized her prior deed purporting to convey the realty to Hubert. Differently, *96 as respects this personalty, it provided: 2. To my son, Hubert A. Foster, I give and will all of the accounts receivable, credits, furnishings, fixtures and equipment located in or used in connection with the operation of the Mayfair Hotel, Pomona, California. Furthermore, the profits or losses attributable to these items were reflected on the income tax returns of the decedent's estate and Hubert did not seek any compensation for the use of his alleged one-half interest. Petitioner's sole argument seems to be that Hubert's undistributed share or capital interest in the partnership was at least as large as decedent's at her death, so that, ipso facto, he owned one-half of these items of personalty. Even if we were to assume that some or all of the personal property located at the hotel was owned by the Mayfair partnership (and this has not been proved), still the record is entirely silent as to the partnership agreement provisions for distributing assets on termination. Thinkably, Hubert may have received undisclosed consideration for his interest, if any, in these assets. Petitioner has failed to prove incorrect respondent's determination in this regard. Issue 3. El Patio *97 Realty Findings of Fact In July 1945, decedent acquired from Ottis a restaurant and cocktail bar in Pomona, known as El Patio, which she and Ottis had been operating as partners. Decedent paid $5,000 down and agreed to pay another $10,000 in 2 years. On March 12, 1949, Hubert assumed the management of the El Patio bar and restaurant for decedent, but received no salary or share of its profits. By a deed dated October 17, 1949, decedent conveyed the El Patio realty to Hubert, the recited consideration being love and affection. The above deed was mailed to Hubert shortly after its execution, and he retained possession of it until it was recorded 8 days after decedent's death, on November 8, 1951. Petitioner's 1954 fiduciary income tax return, signed by Hubert, as executor, reflected the entire operations of El Patio in the following schedule attached to the return: ESTATE OF ETHEL M. BULLOCK
EL PATIO RESTAURANT, Pomona, Calif.
INCOME TAX RETURNS - 1954
Sales:
$29,228.25
Expenses: (Including depreciation of
$1,370)
Total expenses
35,807.85
Net loss
$ 6,579.60
DEPRECIATION
Life
Allowable
Acquired
Cost
(yrs.)
Prior
1954
Building
1951
$20,000.00
20
$2,083.33
$1,000.00
Fixtures and equipment
1951
3,150.00
10
656.25
315.00
Fixtures and equipment
1952
500.00
10
104.16
50.00
Fixtures and equipment
1953
50.00
10
10.42
5.00
$23,700.00
$2,854.16
$1,370.00
*98 Hubert never claimed or received any rent for the use of this property and decedent continued to be the sole recipient of profits from the El Patio's bar and restaurant until her death, at which time its liquor license was in her name. In her original will (dated October 24, 1945), decedent devised the El Patio real estate to Ottis, but by codicil dated October 17, 1949 (the same date that she deeded El Patio to Hubert), she made Hubert, instead of Ottis, the devisee of the property. Decedent gave the Bank of America a financial statement on June 9, 1951, in which she listed the El Patio realty as her own. El Patio was not included in the inventory and appraisement filed by Hubert. The estate tax return listed this property under "Transfers During Decedent's Life," assigned it a value of $28,000 and recited that it had been transferred to Hubert on October 17, 1949, in consideration of services rendered as "manager of El Patio from March 12, 1949 to October 31, 1951." Petitioner did not include this property in determining the gross estate. Opinion Respondent's determination accepts the valuation of $28,000 and includes this property in decedent's gross estate under section *99 811(c)(1)(B), supra. It is hard for us to determine exactly what petitioner's position is as respects El Patio. On brief, petitioner apparently concedes that half the value of the realty should be include in the gross estate and for the first time asserts that only one-half of the El Patio personalty should be so included. Since all of this personalty was included in the estate tax return and so accepted by respondent's determination, there is no issue before the Court as regards it. Petitioner's position as to the realty now seems to be that Hubert had paid for a one-half interest by his services and also in exchange for his alleged interest in an establishment known as B & F Liquor Store which he claims he gave to Ottis in 1951 in satisfaction of the latter's interest [7] in El Patio. The accountant who kept the B & F records testified to the same effect and stated that the capital account in B & F was in Hubert's name. However, the books do not reflect that there was any exchange of such interest for an interest in El Patio, and Hubert's testimony *100 that he received El Patio in consideration of his alleged interest in B & F leaves unexplained the 4-year gap between the time decedent was obligated to pay Ottis the $10,000 balance due in 1947 on the purchase price of El Patio and the asserted transfer of his alleged interest in B & F in satisfaction of this obligation in July 1951. There is but scant evidence in the record supporting Hubert's self-serving testimony, and we do not consider that it alone is sufficient to sustain petitioner's burden of establishing that decedent transferred the El Patio property for an adequate and full consideration in money or money's worth. This is especially true because we cannot find that Hubert ever owned B & F. His testimony on direct examination was as follows: Q. Who owned it now, who owned the B and F liquor store? A. Well, it was operated under mother's name, and my name on the license. But basically, it was supposed to have been mine. Q. Did you pay for it? A. Well, I did in one sense, in one sense I didn't. Mother bought it for me while I was away, but told me she was going to. Considering now petitioner's original position that decedent had made a completed transfer of this *101 realty to Hubert during her lifetime, we believe that the conduct of the parties bespeaks of ownership by decedent until her death. The codicil executed by decedent on the same date as the deed demonstrates an intent on her part that the transfer to Hubert be ineffective for any purpose until her death, and the record clearly establishes that decedent was in fact receiving the economic benefit from the entire El Patio property at the time of her death, because she was receiving all the profits from the El Patio bar and restaurant without paying any rent. Thus, the El Patio property is includible in decedent's gross estate under section 811(c)(1)(B). Estate of Daniel McNichol, supra. Issue 4. Attorneys' Fees in Will Contest By amendment to his answer, filed after trial with leave as to this issue, the respondent seeks disallowance of $4,575 of attorneys' fees on the basis that they were a personal expense of Hubert's. Burden of proof as to this issue is thus on respondent under our Rule 32. Findings of Fact Decedent's will gave Hubert, Zelma, and Ottis each a one-third interest in the residue of her estate. It was contested by Zelma and Ottis. The success of *102 such suit would have decreased Hubert's ultimate participation in the estate, but a settlement was reached prior to trial. The legal fees incurred in such contest were $6,575, but the Superior Court of the State of California, Los Angeles County, having jurisdiction of the administration of this estate, in its order of final settlement and decree of distribution ruled as follows: * * * that * * * the further payment of $6,575.00 extraordinary fees to * * *, attorneys for Executor, is hereby approved and allowed for services rendered in connection with the Contest of Will and sale of real properties in said estate, allowing $2,000.00 of said sum to be chargeable against said estate and the balance charged against the beneficiary Hubert A. Foster; * * *. Opinion Petitioner lays stress on the executor's duty to support the will, and argues that inasmuch as these extraordinary fees were "involved in administration of the estate" they are deductible as administrative expenses. Section 812(b)(2), Internal Revenue Code of 1939, allows such expenses "as are allowed by the laws of the jurisdiction, * * * under which the estate is being administered." Respondent argues that the decree *103 of the California court, enunciating that $4,575 of the fees were personal expenses of Hubert's, disposes of the issue contrary to petitioner's position. In a well-reasoned opinion in Gallagher v. Smith, 223 F. 2d 218 (C.A. 3, 1955), the Third Circuit analyzed the various situations in which state court determinations may affect Federal tax consequences, distinguishing between Federal tax questions as to which there was imposed a "federal criterion" independent of state law and those as to which the results were left by Congress to be governed by state law. Gallagher v. Smith involved a state court determination of rights in property rather than charges against an estate, but the principle is identical and the case is not distinguishable in this regard. The following language from such case is especially pertinent (pages 222-223): The third type of federal tax case in which a state decision is sought to be given effect is that in which a state court has determined the rights of the parties to income or other property involved in the tax litigation and the tax is imposed by the Internal Revenue Code solely upon the person entitled to the income or other property under *104 the state law, the federal law having imposed no qualification upon or criterion for the taxability thereof. In other words Congress has made the operation of the tax law in such a case wholly dependent upon state law. In a case of this sort the state judgment must be given conclusive effect in determining federal tax liability. This is because the right to the income or other property sought to be taxed is created solely by state law. Since by hypothesis no federal qualification or criterion has been imposed and the tax is levied solely upon those in whom the state law has vested the title, the question can only be one of state law. An adjudication of such a question of title by a court of the state must accordingly be given effect, not because it is res judicata against the United States, but because it is conclusive of the parties' property rights which alone are to be taxed. So far as those parties are concerned the law of the state is what the state court has declared and applied in their case. If the state court's judgment has binding final effect under the state law the rights of the parties can only be what the court has held them to be. It is for this reason that the federal *105 court should not in a case of this kind make an independent examination and application of state law. For if it reaches a different conclusion from the state court as to what the parties' rights should be under the state law its decision will not change those rights which will necessarily remain what the state court has declared them to be. * * * To the same effect see Estate of Robert H. Hartley, 5 T.C. 645., Commercial Nat. Bank of Charlotte v. United States, 196 F. 2d 182 (C.A. 4, 1952); and First-Mechanics Nat. Bank v. Commissioner, 117 F.2d 127 (C.A. 3, 1940). Petitioner seeks consolation in our language in Irving Bank-Columbia Trust Co. et al., Executors, 16 B.T.A. 897 (1929), that: (page 905) * * * proper administrative expenses, such as executors' commissions and attorneys' fees, are allowable deductions, even though they have not been allowed by order of the court having jurisdiction of the estate, or paid. * * * A careful scrutiny of this opinion reveals that petitioner has misunderstood the quoted passage for there is nothing in that case to suggest that there had been any decree at all by the local courts. Thus, *106 we were simply applying the recognized rule that if fees have not yet been awarded by the local court but are otherwise due we may determine for ourselves (as we there did) the proper amount of fees under local law. In no sense did we mean to suggest that we were disregarding a local court adjudication in which the proper amount of attorneys' fees had been determined. Accordingly, we feel bound to follow the determination of the California court here and we hold that only $2,000 of the legal fees incurred in the will contest is deductible. Issue 5. Claim of Clara B. Foster Findings of Fact Clara B. Foster was Hubert's wife at all pertinent times. The Mayfair Hotel books contained the following journal entry: Day
Description of Entry
Charges
Credits
* * *
* * *
* * *
* * *
[1951]
10-31
Bank
$4,652.42
Payroll Checks Payable - Clara Foster
$4,345.40
General Expenses
251.76
H. A. Foster, Withdrawal 10714
55.26
(To set aside outstanding P.R. checks and
cancel old checks outstanding and one cancelled The credit to "Payroll Checks Payable - Clara Foster" was posted to the general ledger. Claim for the indicated obligation *107 was never made against the estate, nor paid, although the estate was always solvent. Opinion Petitioner contends that, at the time of decedent's death, Clara B. Foster had uncashed payroll checks in the amount of $4,345.40 that she had received from the hotel and that this amount was also a debt of the hotel, and therefore of the estate. Clara B. Foster did not appear as a witness and the alleged checks were not offered in evidence. Support for petitioner's contention is found in a set of books entitled "Mayfair Hotel," where a journal entry debits a "Bank" account and credits an account called "Payroll Checks Payable - Clara Foster" in the amount of $4,345.40. However, this alone is not sufficient to sustain petitioner's burden of proof in establishing the existence of this alleged debt. Books of account are "neither indispensable nor conclusive," and our decision as to the existence of the alleged debt "must rest upon the actual facts." Doyle v. Mitchell Brothers Co., 247 U.S. 179 (1918). The record discloses evidence contrary to petitioner's contention that Clara held uncashed payroll checks prior to the decedent's death. Decedent's will was contested and the *108 estate was always solvent; it would have been to Clara's and Hubert's advantage to assert such a claim against the decedent's estate, but this was not done. Clara's inaction (allegedly to help Hubert) becomes even more significant when we consider that Hubert was only a one-third residuary beneficiary. Also, this claimed debt was not set forth on decedent's estate tax return, and it was never paid. Accordingly, we find that petitioner has failed to sustain its burden of establishing a debt owing to Clara B. Foster. Issue 6. Bouquet Canyon Realty Findings of Fact During or before May 1927, decedent's application to rent a parcel of United States forestry property in Bouquet Canyon, California, was accepted, and decedent paid all fees necessary to acquire this leasehold. Construction of a mountain recreational cabin on the leasehold was started in May 1927. Hubert did most of the construction of the cabin himself, with the exception of the roofing and putting up the studding. Decedent furnished all of the construction material, [8] except for the doors and windows which were seconds purchased by Hubert. The annual rental on the Bouquet Canyon leasehold was paid by the decedent *109 [9] while she was alive. The decedent was the sole owner of the Bouquet Canyon leasehold and the cabin located thereon at the time of her death. Opinion The full value, in the amount of $2,000, of a cabin and leasehold interest, located in Bouquet Canyon, California, was included in decedent's estate tax return. Petitioner now contends that the inclusion of this item was erroneous, and that only one-half of the value of said cabin and leasehold interest is properly includible in decedent's gross estate. However, petitioner has failed to establish that this property was in fact jointly held by the decedent and Hubert. Although Hubert testified that he did most of the construction of the cabin and bought some of the materials needed, the record is devoid of any evidence that Hubert's actions were in consideration of a joint interest in the cabin, or that the decedent *110 and Hubert actually considered themselves as the joint owners of the cabin. Hubert testified that he did not expect to be paid for every "favor" he did for his mother in connection with this leasehold. Nor is there any indication that Hubert ever expected any payment or that he ever asserted any interest in the property until this proceeding, some 30 years after his services. The proof is most consistent with the theory that whatever construction services Hubert performed were contributed as gifts. The close relationship between Hubert and decedent considered together with the fact that there is no evidence of any agreement to compensate Hubert, again supports this theory. Decedent was Hubert's mother, and it is only natural that he would aid in the construction of a cabin for her. However, such aid did not, ipso facto, make Hubert a joint owner. The property is fully includible in decedent's gross estate. Issue 7. Mortgages, Notes and Cash Respondent determined that the total value of "Mortgages, Notes and Cash" (Schedule C of the estate tax return) includible in decedent's gross estate should be increased by $3,765.36. Petitioner has alleged error. Opinion It may be *111 that some portion of this determination has been contested by petitioner as a part of its case having to do with the issue of the Hotel Mayfair realty or the Hotel Mayfair personalty on the theory that the Hotel Mayfair bank account, which makes up a part of respondent's determination as to this issue, should be includible only to the extent of decedent's interest in the hotel and/or its personalty. Otherwise, petitioner has neither adduced evidence nor made any arguments on brief. Since we have determined that the Hotel Mayfair realty and personalty were whollyowned by decedent, petitioner must fail as to any pro rata exclusion of the hotel's bank account and the balance of respondent's determination under this issue is sustained on failure of proof. Abandoned Issues A. Decedent's estate tax return included, under item 3 of Schedule A, unimproved realty in the amount of $2,250. By its amended petition, petitioner alleges that the inclusion of this property was erroneous. Opinion Petitioner has failed to introduce any evidence in support of this allegation and does not assert it on brief. We conclude that petitioner has abandoned the issue. The value of said realty, uncontested *112 at $2,250, is includible in the gross estate. B. By amendment to his answer made after the trial herein, respondent alleges, inter alia, that he allowed executor's fees in the amount of $2,007.10 as an administrative expense of the estate but that inasmuch as said fees were never paid, the allowance was erroneous and that such amount should be restored to the net estate. Opinion Since respondent has done nothing in this regard since the filing of said amendment and has not argued this matter on brief, we consider that it has been abandoned. Respondent has conceded that petitioner is entitled to a credit for inheritance tax paid to the State of California in the amount of $3,015.07, and the parties agree that petitioner may deduct reasonable fees incurred in this proceeding. Decision will be entered under Rule 50. Footnotes
1. The record is silent as to whether additional partnership returns were filed.↩
2. A note on a schedule attached to this return states that the hotel's adjusted operating losses for 1951, 1952 and 1953 "Includes a partnership interest of Hubert A. Foster, residuary beneficiary." The extent of said partnership is not explained further.↩
3. SEC. 811. GROSS ESTATE. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States - * * *
(c) Transfers in Contemplation Of, or Taking Effect At, Death. - (1) General Rule. - To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise - * * *
(B) under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (i) the possession or enjoyment of, or the right to the income from, the property, or (ii) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom: * * *↩
4. Petitioner's original contention was that this deed was in payment for Hubert's services for many years. On brief, petitioner seems to depart from this position and to argue that Hubert owned at least half of this realty because his capital account in the alleged partnership was at least equal to decedent's. Petitioner now refers to the deed as an "idle act."↩
5. See footnote 3, supra.↩
6. These items are: The On-Sale Liquor License, value $7,500; furniture, furnishings, and equipment, including dining room, kitchen and bar items, value $10,000; and the inventory of liquory, beer and soft drinks, value $4,400.71 - total value $21,900.71.↩
7. The record is unclear, but this "interest" is probably the balance of $10,000 owed to Ottis by decedent on the 1945 sale.↩
8. It can be presumed that decedent also paid for the construction labor other than that performed by Hubert. ↩
9. After about 1941, the rental on the Bouquet Canyon leasehold was paid with checks drawn on the hotel's checking account and such expenditures were charged against the decedent's capital account.↩